# EXHIBIT A

BSCHS - C-0017

## SERVICES AGREEMENT

This **AGREEMENT,** effective as of May 1, 2016 ("**Effective Date**"), is by and between **BON SECOURS CHARITY HEALTH SYSTEM, INC.**, a not-for-profit corporation existing by virtue of the laws of the State of New York, having an office at 255 Lafayette Avenue, Suffern, New York 10901-4869 ("**System**"), on behalf of itself and **Bon Secours Community Hospital, Good Samaritan Hospital of Suffern, NY** and **St. Anthony Community Hospital, Warwick, New York**, each of which is a wholly-owned subsidiary of System ("**Providers**"), and **HORIZON FINANCIAL MANAGEMENT, LLC**, with an office at 9980 Georgia Street, Crown Point, Indiana 46307 ("**Contractor**"). Individually, System and Contractor may be referred to each as a "**Party**," and together as the "**Parties**."

**WHEREAS**, System and Providers require certain revenue cycle consulting services.

**WHEREAS,** Contractor has considerable expertise and is in the business of providing such services and the System desires to engage Contractor to perform such services.

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein, the System and Contractor hereby agree as follows:

1 **Contractor's Services and Obligations**

    a. <u>Services to be Provided</u>. Contractor, in a manner consistent with the highest standards of persons regularly engaged in providing such services, shall provide to System and Providers revenue cycle consulting services as further described on **Schedule A**, attached hereto and made part hereof (the "**Services**").

    b. <u>Contractor Employees</u>.

        i. Contractor warrants that the Services shall be provided in a good, professional and workmanlike manner, using personnel employed or otherwise engaged by Contractor ("**Contractor Employees**") having the proper degree of skill, training and background so as to perform such Services in a timely, competent and professional manner so as to meet the needs of System.

        ii. At Contractor's sole cost, Contractor shall, and shall ensure that all Contractor Employees providing Services hereunder comply with all System and Provider policies and procedures, including requirements for criminal background checks and health clearance as applicable. Contractor Employees providing Services on System and/or Provider premises must be in good health and Contractor shall be responsible for ensuring that all such Contractor Employees meet the health, immunization and infection control criteria required by System, as may be modified from time to time.

        iii. Notwithstanding anything herein to the contrary, in the event that any Contractor Employee assigned to perform Services hereunder is found to be not acceptable to the System for any reason, the System shall notify Contractor of such fact and Contractor shall immediately take appropriate action, which may include immediate removal of such personnel from System's or Provider's premises if the System so requests, and replace such individual with another Contractor Employee acceptable to the System.

    c. <u>Ownership of Records</u>. All records compiled by Contractor in providing and completing the Services, including but not limited to written reports, studies, computer protocols, graphs, charts and all other similar recorded data, shall become and remain the property of the System or a Provider as appropriate.

2 **Term/Termination**

    a. <u>Term</u>. The term of this Agreement shall begin on the Effective Date and shall continue for a term of one (1) year thereafter (the "**Term**").

    b. <u>Termination</u>. System may terminate this Agreement with or without cause, without penalty or liability, upon thirty (30) days prior written notice to the other Party. System, with or without cause and without penalty or liability, may also terminate this Agreement with respect to one or more Providers only while maintaining the Agreement in effect for the other Providers, upon thirty (30) days prior written notice to Contractor, in which case any fees payable pursuant to Section 3 below shall be proportionately adjusted to reflect the removal of such Providers from the scope of the Agreement. The System shall not be

liable for any payments, fees, costs or expenses incurred by Contractor pursuant to this Agreement after notification of a Party's intent to terminate has been received by the receiving Party, unless such expenditures are approved in advance in writing by System. Both Parties agree that their respective obligations hereunder remain in effect until the effective date of termination, unless specifically agreed to otherwise in writing.

3   **Financial Arrangement**

    a.   As consideration for the Services to be provided under this Agreement, the System shall compensate Contractor according to the fee schedule set forth on **Schedule B** attached hereto and made a part hereof.

    b.   Expenses. Contractor shall be responsible for its own expenses in connection with the provision of Services.

    c.   Invoicing. Contractor shall invoice System for Services in accordance with the instructions set forth on **Schedule C** attached hereto and made a part hereof.

    d.   Documentation/Reporting. Contractor shall provide System with the following documentation and reports:

       i.   Monthly Key Performance Indicator ("KPI") Reports. KPI Reports shall minimally reflect accounts referred, recovery rates, closure rates and reasons, and fees earned by Contractor. Reports shall be summarized at facility and local system levels.

       ii.   Documented reconciliation of Contractor's inventory to System's detailed inventory report of active and closed accounts.

       iii.   Documented reconciliation of Contractor's invoice to System's monthly detailed fee report. Contractor shall invoice System for disputed fees within 60 days of receiving the detail fee report, if necessary.

       iv.   Contractor shall provide quarterly feedback on common account issues, trends, and Contractor-identified opportunities to System.

    e.   Right to Audit. The System shall have the right to audit all books and records of Contractor reasonably pertinent to this Agreement at any time during the term hereof and within twenty-four (24) months following termination of this Agreement. This provision shall survive termination or expiration of this Agreement.

    f.   Other Fees and Charges. Any references in this Agreement or in any other document to interest charges, late fees, restocking fees, cancellation charges or similar payments are hereby expressly excluded from this Agreement. System, Providers and their facilities are exempt from local, state, and federal taxes (including local and state sales or use taxes).

4   **Confidentiality**

    a.   All Information Confidential. Contractor represents and warrants that all non-public information communicated by the System and/or Providers to Contractor in connection with the performance of the Services provided under this Agreement shall be regarded as confidential information, used only for the purposes of this Agreement, and in no event shall be disclosed to third Parties, including Contractor's affiliates, partners, employees, agents, or representatives other than those required to provide Services, unless otherwise required by applicable law, judicial or administrative process, professional standards or a court or government agency of competent jurisdiction (other than as may be required for internal quality assurance, management, or legal review purposes) or if disclosure is in connection with litigation between the Parties arising hereunder. This provision survives termination or expiration of this Agreement.

    b.   No Publication Without Consent. Neither Party shall, without first obtaining the written consent of the other Party, advertise or publish the fact that the Contractor or System (or its Providers) has contracted to furnish or receive the Services covered by this Agreement. Neither Party may use the name of the other Party in any advertisement or publication without first obtaining written permission from the other Party.

c.  <u>Protected Health Information</u>.  The Parties shall comply in all respects with the provisions of the Health Insurance Portability and Accountability Act of 1996 "HIPAA" and all regulations promulgated thereunder.  The Parties further agree to comply with the Standards for Privacy of Individually Identifiable Health Information, hereinafter "Privacy Regulations", including the "Business Associate" provisions stated therein.  Contractor shall maintain all patient-related information to which it has access in performing hereunder, including but not limited to medical records (collectively, "Confidential Patient Information"), in the strictest confidence in accordance with all applicable laws and regulations. Without limiting the foregoing, Contractor represents that (i) its personnel have been trained in and will comply with the confidentiality and disclosure requirements set forth in Title 10 of N.Y.C.R.R., including those concerning HIV/AIDS related information; as well as HIPAA, including compliance with the requirements set forth in Providers' Notices of Privacy Practices; and (ii) Contractor shall comply with the Downstream Business Associate Agreement, a copy of which is attached hereto as **Schedule D**.

5  **Insurance**

a.  Contractor shall meet the insurance requirements set forth on **Schedule E**, attached hereto and made a part hereof, covering Contractor and Contractor Employees.  Failure of System to demand evidence of compliance with insurance requirements or failure of System to identify a deficiency from evidence that is provided shall not be construed as a waiver of Contractor's obligation to maintain such insurance.

6  **Indemnification/Liability**

a.  Contractor shall indemnify and hold harmless System, Providers, and their affiliates, and the officers, directors, employees and agents of each from and against any and all claims, damages, awards, actions and settlements damages or expense (including court costs and reasonable attorneys' fees) arising from the act(s) or omission(s) of Contractor, its directors, officers, employees or agents, including, but not limited to, all damages to real property, personal injury, or disclosure of any confidential information. This provision will survive termination or expiration of this Agreement.

b.  The liability of the Parties to each other for damages in connection with this Agreement, regardless of the form of action, shall not exceed the actual damages incurred by the Party seeking redress. Neither Party shall be liable to the other for any special, consequential, punitive, or exemplary damages arising from this Agreement, including but not limited to damages for loss of future business (lost profits). This provision shall not apply to claims raised by third parties against Contractor or System or Providers or to claims in which either Party joins the other as a third party defendant.

7  **Compliance with Laws and Policies**

a.  <u>Conflicts of Interest</u>.  Contractor represents that it has disclosed to the System all relationships or financial interests that may represent or could be construed as a conflict of interest with respect to Contractor's transaction of business with the System.  Except as may be disclosed in writing by Contractor, Contractor further represents that no employee, director or officer of the System or a Provider is a partner, member or shareholder of, or, has a financial interest in Contractor.  For purposes of this Section, the term "financial interest" shall include, but not be limited to, the following transactions or relationships between an employee, director or officer of the System or a Provider on the one hand and Contractor on the other: (a) consulting fees, honoraria, gifts or other emoluments, or "in kind" compensation; (b) equity interests, including stock options, of any amount in a publicly or non-publicly-traded company (or entitlement to the same); (c) royalty income (or other income) or the right to receive future royalties (or other income); (d) any non-royalty payments or entitlements to payments; or (e) service as an officer, director, or in any other role, whether or not remuneration is received for such service.

b.  <u>Personal Inducements</u>.  Contractor represents and warrants that no cash, equity interest, merchandise, equipment, services or other forms of remuneration have been offered, shall be offered or will be paid or distributed by or on behalf of Contractor to System, Providers and/or their respective employees, officers, or directors, or, to any other person, Party or entity affiliated with System or a Provider, as an inducement to purchase or to influence the purchase of services by System from Contractor.

c.  <u>Debarment</u>.  Contractor represents that (i) it has not been convicted of a criminal offense related to health care, and (ii) it is not currently listed by a federal agency as debarred, excluded or otherwise

ineligible for participation in federally funded health care programs. Contractor shall notify the System immediately, in writing, of any change in this representation during the term of this Agreement. Such change in circumstances shall constitute cause by the System to immediately terminate this Agreement. For purposes of this paragraph, Contractor is defined as the entity entering into this Agreement, and/or its principals, employees, directors and officers and shareholders (provided that if Contractor is publicly traded, the term "Contractor" shall not include shareholders owning less than five (5%) percent of the outstanding share of the publicly traded entity).

d. <u>Compliance with Applicable Law and Regulations</u>.  Contractor warrants that all Services purchased pursuant to this Agreement will conform and comply with all applicable provisions of governing laws, ordinances, rules and regulations. Contractor further warrants it shall comply with all applicable laws and regulations in the performance of its duties and obligations hereunder. Without limiting the generality of the foregoing, in accordance with the requirements of the Deficit Reduction Act of 2005, Contractor agrees to adhere to all applicable System and Provider Codes of Conduct and all relevant compliance policies, including without limitation, policies requiring the education of employees regarding the requirements of the Federal False Claims Act and New York State False Claims Act and obligating them to report actual or suspected violations to System or Provider management, Compliance Officer or the anonymous Compliance hotline. In addition, Contractor shall obtain and maintain in full force and effect during the term of this Agreement all licenses, permits, certificates and accreditations as may be required by law or regulation, if any.

e. <u>Non-Discrimination</u>. In performing its obligations hereunder, the Contractor, or any person working on the Contractor's behalf, shall not discriminate, harass or intimidate any individual on account of race, creed, color, sex, sexual orientation, age, disability, national origin, marital status, sexual orientation, genetic predisposition or carrier status.

f. <u>Government Access to Records</u>.  Contractor and System agree to comply with the Omnibus Reconciliation Act of 1980 (P.L. 96-499) and its implementing regulations (42 CFR, Part 420). Contractor further specifically agrees that until the expiration of four (4) years after the expiration or termination of this Agreement, Contractor shall make available, upon written request of the Secretary of the Department of Health and Human Services, the Comptroller General or any of their duly authorized representatives, this Agreement and the books, documents and records of Contractor that are necessary to verify the nature and extent of the costs charged to System hereunder. Contractor further agrees that if Contractor carries out any of the duties of this Agreement through a subcontract with a related organization with a value or cost of ten thousand dollars ($10,000) or more over a twelve (12) month period, such subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of such services pursuant to such subcontract, the related organization shall make available, upon written request to the Secretary, or the Comptroller General or any of their duly authorized representatives, the subcontract and all books, documents and records of such organization that are necessary to verify the nature and extent of such costs. This provision will survive termination or expiration of this Agreement.

g. Consultant agrees that all activities performed in connection with this Agreement and on behalf of Consultant will be consistent with the National Conference of Catholic Bishops "Ethical and Religious Directives for Catholic Health Care Services" as in effect at the time of execution of this Agreement and as modified from time to time.

h. <u>Breach of Representations</u>. A breach of any representation, warranty or covenant under this Section (7) shall be grounds for immediate termination of this Agreement.

8 <u>Miscellaneous</u>

a. <u>Non-Exclusive Agreement/Minimum Work</u>. No exclusive rights are granted under this Agreement, nor has any guarantee, promise or representation of any minimum amount of work or compensation been given nor is any to be inferred from this Agreement.

b. <u>Other Agreements between the Parties</u>. This Agreement shall be placed in System's central database, which contains any other agreements that may exist between the parties relating to other subject matters.

c. <u>Independent Contractor</u>. The Parties expressly agree that the Contractor is an independent contractor and not an employee of the System or any Provider and the Contractor and any third persons working

on the Contractor's behalf hereby waive any right to claim additional benefits, privileges or compensation based on any alleged or purported theory of an employee and employer relationship.

d. <u>Notices</u>. Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed given when personally delivered or sent via a nationally recognized overnight delivery service to the addresses set forth herein, or to such other address as the Parties may designate in writing. Copies of notices to System shall be simultaneously sent to System's Office of Legal Affairs, attn.: General Counsel, at WMCLegalNotices@WMCHealth.org.

e. <u>Assignment</u>. This Agreement may not be assigned in whole or in part, nor may any obligation hereunder be subcontracted by the Contractor without the prior written consent of the System. Any such assignments or subcontract shall not relieve the Contractor of its obligations hereunder. If Contractor shall become insolvent or shall make an assignment for the benefit of creditors, or if a receiver or trustee shall be appointed of or for any of Contractor's property or business, this Agreement may be cancelled, at the System's option, without liability.

f. <u>No Solicitation</u>. During the Term of this Agreement and for a period of at least six months thereafter, Contractor agrees that it will not, without the prior written consent of System, directly solicit or induce to hire any employee of System or a Provider, or in any other way interfere with System or a Provider's contractual or employment relations with any of its employees, agents or subcontractors. During the Term of this Agreement and for a period of at least six months thereafter, System agrees that it will not, without the prior written consent of Contractor, directly solicit or induce to hire any employee of Contrator, or in any other way interfere with Contractor's contractual or employment relations with any of its employees, agents or subcontractors.

g. <u>Force Majeure</u>. Neither Party shall be deemed to be in default of or to have breached any provision of the Agreement as a result of any delay or failure in performance due to reasons beyond such Party's reasonable control. If such a delay occurs, the affected Party may extend the time for performance by a period of time equal to the delay. Notwithstanding the foregoing, if a force majeure event is claimed by Contractor and such event continues for more than five (5) business days, System shall have the right and option to terminate this Agreement.

h. <u>Entire Agreement/Amendment/Attachments</u>. This Agreement and its attachments constitute the entire agreement between the Parties hereto with respect to the subject matter hereof and shall supersede all previous negotiations, comments and writings. This Agreement may be amended only by a written instrument executed by both Parties. To the extent that terms or provisions in the main body of this Agreement conflict with the terms and provisions of any attachment, exhibit, schedule or other referenced document, the terms and provisions of the main body of this Agreement will control.

i. <u>Governing Law</u>. This Agreement shall be construed in accordance with the laws of the State of New York, regardless of conflict of laws provisions. Only the federal or state courts located in Westchester County, New York shall have jurisdiction to hear any dispute under this Agreement. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Agreement, which shall remain in full force and effect and enforceable in accordance with its terms. This provision will survive termination or expiration of this Agreement.

BSCHS - C-0017

j.   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. The Parties agree to accept and be bound by facsimile or PDF transmitted copies of this Agreement and its counterparts including facsimile or PDF signatures of the Parties

**IN WITNESS WHEREFORE,** the Parties have executed this Agreement in duplicate as of the date set forth above.

SYSTEM

By: _Mary Leahy_

Name: _Mary Leahy_

Title: _Chief Executive Officer_

CONTRACTOR

By: _____

Name: _FRANK P. TERMINI_

Title: _Managing Partner_

On behalf of:
BON SECOURS CHARITY HEALTH SYSTEM, INC.
BON SECOURS COMMUNITY HOSPITAL
GOOD SAMARITAN HOSPITAL OF SUFFERN, NY
ST. ANTHONY COMMUNITY HOSPITAL, WARWICK, NEW YORK

BSCHS - C-0017

## SCHEDULE A
## SERVICES

### A. EARLY-OUT SELF-PAY PROJECT

1  Contractor will pursue recovery of all "patient obligation" accounts placed with it as determined by System. Patient obligation is defined as 100% of the account balance is owed by the patient.

2  Contractor will interface with System and the Providers through the use of: (a) the Clearinghouse technology for placement, payment and adjustment information, and (b) vendor requests codes (which will be established by System and Contractor) to exchange information and to request assistance with account activity.

3  Insurance Follow-up and Re-billing: Appropriate insurance follow up will be performed by Contractor for any account identified to have valid insurance or other payer source after referral to Contractor. Contractor will re-bill and appeal accounts as needed and continue insurance follow up to ensure prompt payment from insurance is received by System. Contractor will perform the re-billing within System's electronic billing system.

4  Contractor will maintain a level of customer complaints under 1% for each and every placement. For this purpose a customer complaint is defined as, "a legitimate and validated complaint related directly to Contractor's performance of the Services, as mutually agreed upon by Contractor and the System's Senior Director of Revenue Cycle or designee responsible for outsourcing for System.

5  Contractor will at all times act responsibly and in accordance with System's values when working System accounts and dealing with System's patients, employees and business partners.

6  Contractor and System will mutually agree upon the file layout and disposition codes to be used when Contractor returns accounts to System.

7  Contractor will receive from System reports that document the accounts referred, recovery rates, and fees earned on a monthly basis.

8  Contractor will assign a coordinator to address/resolve operational concerns with System, when and where applicable.

9  Contractor will assign a coordinator to address/resolve information technology concerns with System, when and where applicable.

10  Contractor must reconcile its inventory in full to System records on a weekly basis, at a minimum, and report any errors to System.

### Work Standards – Early Out Self-Pay Accounts

**Patient Obligations Services:**

1  Contractor will authorize acceptable patient payment plans that adhere to System policies and procedures as provided to Contractor by the Director or designee.

2  Collectors working System accounts will generally be dedicated to System accounts, as warranted by volume and agreed to by System and Contractor.

3  Contractor will work accounts for up to fifteen (15) days after the final letter in a form prescribed by System is sent to the patient after which time the account will be recalled by the Clearinghouse if no payments posted in the preceding thirty (30) days for placement to a Bad Debt vendor excluding active payment arrangements accounts. If the Contractor does not return the account System will pull the account. System reserves the right to revise the final letter at any time.

4  System may withdraw an account from Contractor at any time; however, amounts paid are subject to the fee schedule as provided in Exhibit B.

5  Contractor will immediately stop work on and return accounts recalled by the System for reasons such as risk management and VIP issues.

BSCHS - C-0017

6   As directed by System, Contractor shall direct all moneys to System.  If Contractor receives moneys directly, Contractor will remit within one week all moneys, without reduction or any withholding, along with associated detail to System.

7   Patients will be given the option of paying with all credit card companies with which System has an agreement.  Contractor will process credit card payments using the System's merchant number(s).

**Transfer of Placements:**

1   Contractor may receive placements from System on a daily basis any business day of the week.  Contractor must be able to receive placements on electronic media as defined by System and its Clearinghouse.  Costs associated with the receiving of the placement media will be the responsibility of Contractor.

2   Payment and adjustment data will be transmitted to Contractor each business day.  Contractor is responsible for coordinating, programming and costs associated with convenient electronic data transfer process with System.

**Implementation of Program:**

Contractor will be responsible for implementing the specific work standards as defined herein and organize the procedures for managing the daily/weekly volume of data processing, i.e., direct payments, EOB's and medical records requests.

**Customer Service Management:**

Monthly conference calls between System and Contractor will be scheduled to review financial performance, customer service and other related items including performance reports provided by both parties.

**Process for Return of Accounts – Early Out Self-Pay Accounts**

1   Mutually agreed upon codes will be used to indicate the reason an account is returned.

2   The appropriate code being sent via the Clearinghouse to the appropriate Provider will be the means by which an account is returned.

3   Electronic copy of account notes will be sent to the Clearinghouse at the time each account is returned.

4   Contractor will provide System with a key that defines any codes used within the collection software used by Contractor.

5   Contractor will return to each applicable Provider all information concerning the accounts and will not retain any copies of such information except that which is required by law.

**Responsibilities of System – Early Out Self-Pay Accounts**

1   System will calculate Contractor's fees monthly. All payments processed through System or the Providers' posting processes by the end of the month in which they were received will be included on the Contractor Detailed Fee Report. System shall provide a detail fee report to Contractor by the 10th calendar day of each month for payments generated to System during the preceding month for accounts in the Contractor's inventory.

2   To the extent permitted by applicable law, System or its Clearinghouse shall convey to Contractor complete approved demographic and financial information electronically in a clearinghouse format agreed upon by the parties.

3   System will post cash (and contractual write-offs and adjustments) on accounts outsourced to Contractor each business day (Monday through Friday) and report them to Contractor daily.

4   System will provide all correspondence related to accounts outsourced to Contractor within three (3) business days of receipt by System.

BSCHS - C-0017

5   As reasonably requested by Contractor, System shall provide data collection services necessary for the provision of the Services via mutually agreed action codes transmitted in an electronic medium. Every reasonable attempt must be made by both parties to eliminate manual processing.

6   To the extent it may affect the Contractor's use or disclosure of Protected Health Information, System or the applicable Provider shall notify Contractor of any restriction to the use or disclosure of Protected health Information that System or Provider has agreed to in accordance with 45 CFR § 164.522 of the HIPAA Privacy Rule.

## B. SPECIAL PRE-COLLECT SERVICES

1   Accounts that are deemed by System to be unresolved third party insurance accounts previously worked by their CBO & perhaps another outsourcing vendor, will be referred to Contractor and shall have an outstanding insurance balance between 300 and 400 days after final bill date resulting from a claim for medical services provided by the Providers ("Special-Pre-Collect Accounts"). Accounts shall be assigned via auto-outsourcing by System. Low-dollar accounts shall be referred earlier than high-dollar accounts. Accounts shall be assigned and recalled based solely on System's discretion. Contractor shall be able to accept referrals from System via auto-outsourcing and/or manual placement files. System shall make best effort to refer to Contractor only those patient accounts determined by System to be just and owing. There is no guaranteed minimum number of accounts within this scope of work. Contractor shall pursue any and all insurance payment sources for insurance balance due on all accounts immediately upon receipt of referral from System and shall work to resolve the account until the insurance balance is collected in full. Contractor shall rebill and appeal accounts as needed and continue insurance follow up until a final resolution is achieved by Contractor. All services provided by Contractor shall be in accordance to the work standards developed by System.

2   Contractor shall communicate all secured or coordinated payments to System upon receipt utilizing account maintenance tools, comprehensive notation on accounts, and or seamless interfacing with System host systems. Contractor's notes must successfully be returned to System through coordinated notes upload interface, daily, and accounts must be noted every 45 days to avoid mandatory recall of accounts due to no activity by Contractor. This shall also justify that substantial work is being performed by Contractor. Contractor must reconcile its inventory in full to System records at a minimum of every 30 days.

3   Contractor shall assign experienced Special-Pre-Collect insurance follow-up specialists in accordance with staff-to-account ratios mutually agreed upon by System and Contractor to service System's accounts. Contractor shall notify System in advance, to receive approval, should it be necessary for Contractor to re-assign placements to another of its locations, or affiliated firms, for Special-Pre-Collect work. All administrative functions of Contractor (such as contract maintenance, generation of reports, human resources, etc.) shall be based at the principal office location of Contractor in Crown Point Indiana.

### Training and Certifications

1   System shall provide Contractor with training on the utilization of Epic (if needed) and System Clearinghouse computer systems. System shall provide continuing support for Contractor operations in System systems necessary to complete the scope of work. System shall provide Contractor with training on relevant internal policies and procedures regarding collections of insurance balance monies.

2   Contractor shall provide their staff with training required to successfully perform the scope of work defined in this document to include job-specific training or any proficiency training related to Special-Pre-Collect services.

3   Contractor shall provide documentation of any and all required certifications and licensure for each staff member prior to providing services to System. This requirement includes any and all state-specific requirements. Contractor shall maintain up-to-date certifications and licensures for all staff.

BSCHS - C-0017

## C. BAD DEBT

1. Contractor agrees to provide System and the Providers with certain account placements for bad debt collection services, including contacting accounts, establishing payment schedules, collecting payments. A primary placement account means an account has not been previously placed with a collection agency for collection services. A secondary or tertiary placement account means an account that has been previously placed with a collection agency for collection services and such account has been returned to System or a Provider from the original collection agency for additional collection activity.

2. Accounts will be received by Contractor via Auto Outsourcing system. Primary Bad Debt accounts will not be received prior to 127 days from date of service. Secondary Bad Debt placements will occur as a timeout from Primary Placement after 180 days if no payment is posted within the preceding 60 days. Tertiary Bad Debt placements will occur as a timeout from Secondary Placement after 180 days if no payment is posted within the preceding 60 days.

3. System may withdraw an account from Contractor at any time; however, amounts paid are subject to the fee schedule as provided in Schedule B.

4. Contractor will interface with System and the Providers through the use of the clearinghouse for placement and payment and adjustment information daily.

5. Contractor will interface with System and the Providers through the use of vendor requests codes (which will be established by System and Contractor) to exchange information and to request assistance with account activity.

6. Contractor will ensure that the services to be provided by Contractor to System and the Providers under this Agreement are provided in accordance with all applicable federal, state and local laws, regulations, and rules governing the Services, including the Fair Debt Collection Practices Act (FDCPA). Contractor agrees to treat all of the Providers' patients, employees and business partners in accordance with the values and mission of the Sisters of Bon Secours. Contractor warrants that it will use best industry practices in performing the Services.

7. Contractor and System will each supply the other monthly an inventory of open accounts in a mutually agreed upon format for the purpose of reconciliation. System will make its best efforts to supply a complete daily transaction file to the Contractor.

8. As directed by System, Contractor shall direct all moneys to System.

9. If Contractor receives moneys directly, Contractor will remit within 1 week all moneys, without reduction or any withholding, along with associated detail to System.

10. All accounts will be reported by Contractor, at Contractor's expense, to all major credit bureaus after sixty (60) days from placement unless Contractor is not confident with the accuracy of the amount or the individual collector is holding off as a collection strategy. Contractor will report, at Contractor's expense, to all major credit bureaus when an account is withdrawn from Contractor.

11. Contractor will process any discovered third party liability billing of insurance claims.

12. Contractor will authorize acceptable patient payment plans that adhere to System policy and procedures as follows:

    (a) Collecting the balance in full.

    (b) 10% of the balance per month for 12 months, $25.00 minimum acceptable payment.

    (c) Payment arrangements greater than 12 months will require approval by the System's Director responsible for Contractor relations.

    (d) Contractor may offer a discount of up to 50% of amounts due in order to achieve immediate settlement of an account (i.e., the account balance will be zero following a single payment on behalf of the account; provided that if such discount is greater than $750, the System's Director responsible for Contractor relations must approve the settlement.

BSCHS - C-0017

13. Contractor shall ensure that customer complaint rate related to the Services or any interactions between Contractor and accounts provided by System is less than 1%. Contractor shall promptly provide System with all documentation related to a complaint of an account provided by System.

14. Contractor must reconcile their inventory in full to System records on a weekly basis, at a minimum, and report any errors to System.

15. Patients will be given the option of paying with all credit card companies with which the System has an agreement. Contractor will process credit card payments using the System's hospital's merchant number(s).

## Process for Return of Accounts – Bad Debt

1. Mutually agreed upon codes will be used to indicate the reason an account is returned.

2. The appropriate code being sent via the System's clearinghouse to the appropriate Provider will be the means by which an account is returned.

3. Electronic copy of account notes will be sent to System's clearinghouse at the time each account returned.

4. Contractor will provide System with a key that defines any codes used within the collection software used by Contractor.

5. Contractor will return to each applicable Provider all information concerning the accounts and will not retain any copies of such information except that which is required by law.

## Responsibilities of System – Bad Debt

1. System will calculate Contractor's fees monthly. All payments processed through System's or the Providers' posting processes by the end of the month in which they were received will be included on the Detail Fee Report.

2. System shall provide a detail fee report to Contractor by the 10th calendar day of each month for payments generated to System during the preceding month for accounts in the Contractor's inventory.

3. To the extent permitted by applicable law, System or its clearinghouse shall convey to Contractor complete demographic and financial information electronically in a clearinghouse format agreed upon by the parties.

4. System will post cash (and contractual write-offs and adjustments) on accounts outsourced to Contractor daily (Monday through Friday) and report them to Contractor no less than weekly.

5. System will provide all correspondence related to accounts outsourced to Contractor within 3 business days of receipt by System.

6. As reasonably requested by Contractor, System shall provide data collection services necessary for the provision of the Services via mutually agreed action codes transmitted in an electronic medium. Every reasonable attempt must be made by both parties to eliminate manual processing.

7. To the extent it may affect the Contractor's use or disclosure of Protected Health Information, System or the applicable Provider shall notify Contractor of any restriction to the use or disclosure of Protected health Information that System or Provider has agreed to in accordance with 45 CFR § 164.522 of the HIPAA Privacy Rule.

## Work Standards – Bad Debt Accounts

1. Contractor will implement appropriate and dedicated staff-to-account ratio, as mutually agreed upon with System. Contractor will further provide to System in writing the staff-to-account ratio assigned to System's business on a month-to-month basis.

2. Contractor will process accounts within three (3) working days of placement by the Clearinghouse.

3. Contractor will utilize predictive dialer strategies where appropriate and initiate campaigns for accounts up to $250, unless otherwise agreed to by System.

BSCHS - C-0017

4.      Contractor will establish collection teams to process and manage accounts greater than $250, unless otherwise agreed to by System.

5.      Contractor will maintain a level of customer complaints under 1% for each and every placement. For this purpose a customer complaint is defined as, "a legitimate and validated complaint as determined by the Director responsible for outsourcing at System and validated by the Contractor representative. The Director responsible for outsourcing for System will have final say in the validity of the complaint.

6.      Contractor will at all times act responsibly and in accordance with System's values when working System accounts and dealing with System's patients, employees and business partners.

7.      Contractor will work with System on technology requirements as stipulated in the Agreement. Contractor further agrees to accept changes in technology requirements through formal addendum process.

8.      Contractor will accept System's file layout and disposition codes to be used during turn back process.

9.      Contractor will receive from System reports that document the accounts referred, recovery rates, and fees earned on a monthly basis.

10.     Contractor will assign a coordinator to address/resolve operational concerns with System, when and where applicable.

11.     Contractor will assign a coordinator to address/resolve information technology concerns with System, when and where applicable.

12.     System will post cash (and contractual write-offs and adjustments) on accounts outsourced to Contractor daily and report same in the manner specified in the Agreement.

**SCHEDULE B**
**FEE SCHEDULE**

1. The fee to be paid for the Services provided by Contractor will be determined by multiplying the percentage below by the amount of the payment actually received by the applicable Provider on an account that:

    a) Is placed with the Contractor at the time payment is posted.
    b) Had been placed with Contractor within seven (7) calendar days of the date payment is posted.
    c) Has substantial work (i.e., note) on account in advance of payment posting.
    d) Had been placed with Contractor within 180 days of the date payment is posted or payment is posted within seven (7) calendar days following the recall of the respective account.

2. The fee will be paid to Contractor only after the payment has been posted by System's Transaction Posting.

- Primary Placement Bad Debt Contractor Collection Fee shall be 15%.
- Second Placement Bad Debt Contractor Collection Fee shall be 35%.
- Tertiary Placement Bad Debt Contractor Collection Fee shall be 50%.
- Single Account Fee Cap of $5,000 on any one bad debt account.
- Early Out Self-Pay Contractor Collection Fee shall be 8%.
- Single Account Fee Cap of $3,500 on any one early out self-pay account.
- Special Pre-Collect Contractor Fee shall be 38%.
- Single Account Fee Cap of $5,000 on any one special pre-collect account.

3. Notwithstanding anything to the contrary in this Agreement, the fee System shall pay for "early out self-pay" services provided by Contractor will be ten percent (10%) for each month in which the conversion rate of Contractor's services is equal to or greater than ten percent (10%). Contractor's conversion rate shall be computed on a monthly basis using the following formula:

    Collections / (Placements less any System Administrative Recalls)

The Single Account Fee applies to this section 3. In any month that the conversion rate is equal to or greater than ten percent (10%), System shall pay the ten percent (10%) rate stated in this section 3 for each dollar collected by Contractor's efforts, subject only to the Single Account Fee.

4. System shall NOT reimburse Contractor for travel, lodging, and meal expenses incurred in performance of the Services.

5. Notwithstanding anything to the contrary herein, System is not obligated to pay the Contractor Collection Fee on amounts collected by Contractor within seven (7) calendar days of placement of the account with Contractor

6. System shall remit to Contractor within forty-five (45) business days following distribution of the monthly "Contractor Detailed Fee Report," all fees for payments generated to System during the preceding month.

7. System will notify Contractor when a negotiable instrument is paid directly to System, and reported to Contractor and on which collection fees were invoiced, is returned by debtor's bank - (this will be identified through the monthly Detailed Fee Report). System will charge back any negotiable instrument paid directly to System which is returned by debtor's bank and which was previously reported and invoiced to Contractor. 8. System will list such returned negotiable instruments on the next Detailed Fee Report as a minus payment and a minus collection fee.

9. The State of New York requires System to collect a surcharge on self-pay balances (the "Surcharge"). Contractor's commission will be based on the amount collected on a self-pay balance after deducting the Surcharge, when applicable.

BSCHS - C-0017

## SCHEDULE C
## INVOICING INSTRUCTIONS

In order for invoices to be processed and recorded in a timely and accurate manner, the instructions set forth below are very important. Invoices not delivered in one of the three options below may experience significant payment delays, and System shall not be responsible for late fees.

1.  Invoice Delivery

We have three options for submitting invoices. Please select only one of the following methods:

a)  **EDI:** This is our first preference. Please confirm with your IT department that you can support ANSI X12 standards. If you can, please email **AP_EDI_Service@bshsi.org** to coordinate the setup of EDI invoicing.

b)  **EMAIL:** This "green" option is becoming more popular, and is an option that we recommend. Invoices with a Lawson, ten-digit Purchase Order number can be emailed to **POEmail@bshsi.org**. All other invoices can be emailed to **NonPOEmail@bshsi.org** (only current, original invoices should be sent via these email addresses).

c)  **US Mail:** Finally, our third preference is for invoices to be sent through regular mail. Please be sure to use our billing address (no other address should be used): P.O. BOX 6189, Ellicott City, MD 21042.

2.  Invoice Information

In order to assist us in routing and processing invoices timely for approval and payment, please ensure the following:

a)  Your invoice is clear and legible.

b)  The invoice number and date are easily identified.

c)  For PO invoices, the full 10-digit Lawson PO number used to place the order is listed on the invoice. Example: 2402056423

d)  For Non-PO invoices, an ImageNow queue name is present. This is important and shall be given to you by the System employee ordering your good or service. Example: BSR 2403 Cardiac Cath.

3.  Invoice Payment

Similar to having a variety of invoice delivery options, we also have a variety of payment options. Due to transactional costs for System and our vendors, we are phasing out the use of traditional checks. Our preferred electronic payment method is via credit card settlement, but ACH payment is also available. System uses Bank of America programs for each method. Enrollment in either program is quick and easy, and shall simplify the accounts receivable process. Enrollment is expected within thirty (30) days of execution of any vendor agreement. In order to obtain additional information on how to enroll in one of our electronic payment methods, please contact **APPMO_Service@bshsi.org**.

If there are any questions about any of the above information, or if payments ever go beyond their due date, our customer service team can be contacted via email at **AP_Service@bshsi.org** or via phone at 1.888.383.8000. Please provide your vendor number when inquiring about payment status of invoices.

BSCHS - C-0017

## SCHEDULE D

*Copy of Downstream Business Associate Agreement*
*See attached*
*Additionally, a copy is available by contacting the Office of Legal Affairs at WMCLegalNotices@WMCHealth.org*

BSCHS - C-0017

## SCHEDULE E
## INSURANCE

1.      Prior to providing the Services hereunder, the Contractor shall obtain at its own cost and expense the insurance required herein from a licensed insurance company, carrying a Best's financial rating of A or better, and shall provide evidence of such insurance to the System, which evidence shall be subject to System's approval. The policies or certificates thereof shall provide that System shall receive thirty (30) days' written notice prior to cancellation of or material change in the policy, which notice shall name Contractor, identify this Agreement, and be sent via registered mail, return receipt requested. Failure of the Contractor to obtain and maintain any insurance required hereunder shall not relieve the Contractor from any of its obligations hereunder, including but not limited to indemnification, or from any Contractor liability hereunder. All property losses shall be made payable to, and adjusted with, the System. If claims for which Contractor may be liable are filed against either Party, and if such claims exceed the coverage amounts required herein, System may withhold such excess amount from payment due to Contractor until the Contractor furnishes additional security covering such claims in a form satisfactory to the System.

2.      The Contractor shall provide proof of the following coverage:*
        (a)      Workers' Compensation. Contractor shall provide to System a certificate form C-105.2 or State Fund Insurance Company form U-26.3 as proof of compliance with the New York State Workers' Compensation Law, and State Workers' Compensation Board form DB-120.1 as proof of compliance with the New York State Disability Benefits Law, provided, however, that if Contractor is self-insured for Worker's Compensation and/or Disability coverage, a New York State Workers' Compensation Board certificate evidencing such fact. Location of operation shall be "All locations in Rockland County, New York."
        (b)      Employer's liability insurance with a minimum limit of $100,000.
        (c)      General liability insurance with a minimum limit of liability per occurrence of $2,000,000 for combined bodily injury and property damage, naming the System as an additional insured. This insurance shall indicate the following coverage on the certificate of insurance:
                        (i) Premises - Operations.
                        (ii) Broad Form Contractual.
                        iii) Independent Contractor and Sub-Contractor.
                        (iv) Products and Completed Operations.
        (d)      Professional liability insurance ("acts or omissions") on an occurrence basis covering the Contractor and its employees and agents, with minimum limits of $3,000,000 in the annual aggregate.
        (e)      Vehicle liability insurance with a minimum limit of liability per occurrence of $1,000,000 for bodily injury and a minimum limit of $100,000 per occurrence for property damage or a combined single limit of $1,000,000. This insurance shall include the following coverage for bodily injury and property damage arising out of the use of owned, hired and non-owned vehicles.

3.      All policies and certificates of insurance required herein shall provide that:
        (a)      The insurer, or Contractor if it is self-insured, shall have no right to recovery or subrogation against the System (including its employees and agents), it being the intention of the Parties that the insurance policies shall protect both Parties and be primary coverage for any and all losses covered by the insurance.
        (b)      The insurer, or Contractor if it is self-insured, shall have no recourse against the System (including its employees or agents) for payment of any premiums or for assessments under the policy.
        (c)      Contractor assumes responsibility, and is solely at risk for, any and all deductibles.
        (d)      The clause "other insurance provisions" shall not apply to the System.

16

BSCHS - C-0017

## DOWNSTREAM HIPAA BUSINESS ASSOCIATE AGREEMENT

This Downstream Business Associate Agreement, dated as of May 1, 2016 ("BA Agreement"), supplements and is made a part of the Services Agreement (as defined below) by and between **Bon Secours Charity Health System, Inc.** ("BSCHS") and **Horizon Financial Management, LLC** ("**Business Associate**"). BSCHS and Business Associate may be referred to herein collectively as the "Parties" or individually as Party.

WHEREAS, BSCHS is a "business associate" of certain health care provider entities which are wholly-owned subsidiaries of BSCHS, namely, Good Samaritan Hospital of Suffern, N.Y., St. Anthony Community Hospital, Warwick, New York, Bon Secours Community Hospital, St. Francis Center at the Knolls, Inc., and BSCHS Medical Group, P.C. (each a "Covered Entity"); and, as such, BSCHS has entered into a "business associate agreement" with each Covered Entity.

WHEREAS, BSCHS has entered into the Services Agreement with Business Associate for the benefit of one more such Covered Entities, pursuant to which Business Associate creates, receives, maintains or transmits Protected Health Information from or on behalf of BSCHS and/or the Covered Entities, which information is subject to protection under the Federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 (the "HITECH Act"), and related regulations promulgated by the Secretary ("HIPAA Regulations").

WHEREAS, in light of the foregoing and the requirements of HIPAA, the HITECH Act, and HIPAA Regulations, Business Associate and BSCHS agree to be bound by the following terms and conditions.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Definitions.

    a.    General. Terms used, but not otherwise defined, in this BA Agreement shall have the same meaning given to those terms by HIPAA, the HITECH Act and HIPAA Regulations as in effect or as amended from time to time.

    b.    Specific.

        i.    Breach. "Breach" shall have the same meaning as the term "breach" in 45 CFR § 164.402.

        ii.    Electronic Health Record. "Electronic Health Record" shall have the same meaning as the term "electronic health record" in the HITECH Act, Section 13400(5).

        iii.    Electronic Protected Health Information. "Electronic Protected Health Information" shall have the same meaning as the term "electronic protected health information" in 45 CFR § 160.103, limited to the information that Business Associate creates, receives, maintains, or transmits from or on behalf of BSCHS and/or a Covered Entity.

        iv.    Individual. "Individual" shall have the same meaning as the term "individual" in 45 CFR § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502(g).

1232150v.5

v.     Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164.

vi.     Protected Health Information. "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR § 160.103, limited to the information created or received by Business Associate from or on behalf of BSCHS.

vii.     Required By Law. "Required by Law" shall have the same meaning as the term "required by law" in 45 CFR § 164.103.

viii.     Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

ix.     Security Rule. "Security Rule" shall mean the Security Standards at 45 CFR Part 160 and Part 164.

x.     Services Agreement. "Services Agreement" shall mean any present or future agreements, either written or oral, between BSCHS and Business Associate under which Business Associate provides services to BSCHS which involve the use or disclosure of Protected Health Information. The Services Agreement is amended by and incorporates the terms of this BA Agreement.

xi.     Subcontractor. "Subcontractor" shall have the same meaning as the term "subcontractor" in 45 CFR § 160.103.

xii.     Unsecured Protected Health Information. "Unsecured Protected Health Information" shall have the same meaning as the term "unsecured protected health information" in 45 CFR § 164.402.

2.     Obligations and Activities of Business Associate.

a.     Use and Disclosure. Business Associate agrees not to use or disclose Protected Health Information other than as permitted or required by the Services Agreement, this BA Agreement or as Required By Law. Business Associate shall comply with the provisions of this BA Agreement relating to privacy and security of Protected Health Information and all present and future provisions of HIPAA, the HITECH Act and HIPAA Regulations that relate to the privacy and security of Protected Health Information and that are applicable to BSCHS and/or Business Associate.

b.     Appropriate Safeguards. Business Associate agrees to use appropriate safeguards and comply, where applicable, with the Security Rule to prevent the use or disclosure of the Protected Health Information other than as provided for by this BA Agreement. Without limiting the generality of the foregoing sentence, Business Associate will:

i.     Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of Electronic Protected Health Information as required by the Security Rule; and

ii.     Ensure that any Subcontractor to whom Business Associate provides Electronic Protected Health Information agrees in writing to implement reasonable and appropriate safeguards and comply, where applicable, with the Security Rule to protect Electronic Protected Health Information and comply with the other requirements of Section 2(a) above.

c.    Reporting. Business Associate agrees to promptly, and at most within three (3) business days, report to BSCHS any of the following:

i.    Any use or disclosure of Protected Health Information not permitted by this BA Agreement of which Business Associate becomes aware.

ii.    Any Security Incident of which Business Associate becomes aware.

iii.    The discovery of a Breach of Unsecured Protected Health Information.

A Breach is considered "discovered" as of the first day on which the Breach is known, or reasonably should have been known, to Business Associate or any employee, officer or agent of Business Associate, other than the individual committing the Breach. Any notice of a Security Incident or Breach of Unsecured Protected Health Information shall include the identification of each Individual whose Protected Health Information has been, or is reasonably believed by Business Associate to have been, accessed, acquired or disclosed during such Security Incident or Breach as well as any other relevant information regarding the Security Incident or Breach. Any such notice shall be directed to BSCHS pursuant to the notice provisions of the Services Agreement.

d.    Mitigation. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate or its employees, officers, Subcontractors or agents in violation of the requirements of this BA Agreement (including, without limitation, any Security Incident or Breach of Unsecured Protected Health Information). Business Associate shall keep BSCHS fully apprised of all mitigation efforts of the Business Associate required under this Section 2(d).

e.    Investigation. Business Associate agrees to reasonably cooperate and coordinate with BSCHS in the investigation of any violation of the requirements of this BA Agreement and/or any Security Incident or Breach.

f.    Reports and Notices. Business Associate shall also reasonably cooperate and coordinate with BSCHS in the preparation of any reports or notices to the Individual, a regulatory body or any third party required to be made under HIPAA, HIPAA Regulations, the HITECH Act, or any other Federal or State laws, rules or regulations, provided that any such reports or notices shall be subject to the prior written approval of BSCHS.

g.    Subcontractors. Business Associate shall ensure that any Subcontractor to whom Business Associate provides Protected Health Information received from, or created, maintained, received or transmitted by, Business Associate on behalf of BSCHS agrees in writing to the same restrictions and conditions that apply through this BA Agreement to Business Associate with respect to such information.

h.    Access to Designated Record Sets. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of BSCHS, within three (3) business days of such request, to Protected Health Information in a Designated Record Set, to BSCHS or, as directed by BSCHS, to an Individual in order to meet the requirements under HIPAA Regulations. If an Individual makes a request for access to Protected Health Information directly to Business Associate, Business Associate shall notify BSCHS of the request within three (3) business days of such request and will cooperate with BSCHS and allow BSCHS to send the response to the Individual.

3

    i.    <u>Amendments to Designated Record Sets</u>. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the BSCHS directs or agrees to pursuant to HIPAA Regulations at the request of BSCHS or an Individual, within three (3) business days of any such request. If an Individual makes a request for an amendment to Protected Health Information directly to Business Associate, Business Associate shall notify BSCHS of the request within three (3) business days of such request and will cooperate with BSCHS and allow BSCHS to send the response to the Individual.

    j.    <u>Access to Books and Records</u>. Business Associate agrees to make its internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, BSCHS available to the BSCHS, or to the Secretary, within three (3) business days of such request or in the time and manner otherwise designated by the Secretary, for purposes of the Secretary determining BSCHS's compliance with the Privacy Rule.

    k.    <u>Accountings</u>. Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for BSCHS to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with HIPAA, HIPAA Regulations and the HITECH Act.

    l.    <u>Requests for Accountings</u>. Business Associate agrees to provide to BSCHS or an Individual, within twenty (20) days of a request by BSCHS, information collected in accordance with Section 2(k) of this BA Agreement, to permit BSCHS to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with HIPAA, HIPAA Regulations and the HITECH Act. If an Individual makes a request for an accounting directly to Business Associate, Business Associate shall notify BSCHS of the request within three (3) business days of such request and will cooperate with BSCHS and allow BSCHS to send the response to the Individual.

3.    <u>Permitted Uses and Disclosures by Business Associate</u>.

    a.    <u>Services Agreement</u>. Except as otherwise limited in this BA Agreement, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, BSCHS as specified in the Services Agreement, provided that such use or disclosure would not violate HIPAA, HIPAA Regulations or the HITECH Act if done by BSCHS or the minimum necessary policies and procedures of the BSCHS.

    b.    <u>Use for Administration of Business Associate</u>. Except as otherwise limited in this BA Agreement, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

    c.    <u>Disclosure for Administration of Business Associate</u>. Except as otherwise limited in this BA Agreement, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that (i) disclosures are Required by Law, or (ii) Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

4.    Permissible Requests by BSCHS.  Except as set forth in Section 3 of this BA Agreement, BSCHS shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by BSCHS.

5.    Term and Termination.

    a.    Term. This BA Agreement shall be effective as of the date of this BA Agreement and shall terminate when all of the Protected Health Information provided by BSCHS to Business Associate, or created, received or maintained by Business Associate on behalf of BSCHS, is destroyed or returned to BSCHS, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

    b.    Termination for Cause. Upon BSCHS's knowledge of a material breach by Business Associate of the terms of this BA Agreement, BSCHS shall either:

        i.    Provide an opportunity for Business Associate to cure the breach or end the violation. If Business Associate does not cure the breach or end the violation within the time specified by BSCHS, BSCHS shall terminate: (A) this BA Agreement; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected Health Information; and (C) such other provisions, if any, of the Services Agreement as BSCHS designates in its sole discretion; or

        ii.    Notwithstanding anything contained in the Services Agreement to the contrary, if Business Associate has breached a material term of this BA Agreement and cure is not possible, immediately terminate: (A) this BA Agreement; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected Health Information; and (C) such other provisions, if any, of the Services Agreement as BSCHS designates in its sole discretion.

    c.    Effect of Termination.

        i.    Except as provided in Section 5(c)(ii), upon termination of this BA Agreement, for any reason, Business Associate shall return or destroy all Protected Health Information received from BSCHS, or created or received by Business Associate on behalf of BSCHS. This provision shall apply to Protected Health Information that is in the possession of Subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

        ii.    In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to BSCHS notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of this BA Agreement to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

6.    Indemnity.  Business Associate agrees to indemnify, defend and hold harmless BSCHS and its employees, directors/trustees, members, professional staff, representatives and agents (collectively, the "Indemnitees") from and against any and all claims (whether in law or in equity), obligations, actions, causes of action, suits, debts, judgments, losses, fines, penalties, damages, expenses (including attorney's fees), liabilities, lawsuits or costs incurred by the Indemnities which arise or result from a breach of the terms and conditions of this BA Agreement or a violation of HIPAA, the HITECH Act or HIPAA Regulations by Business Associate or its employees or agents.  Business Associate's indemnification

obligations hereunder shall not be subject to any limitations of liability or remedies in the Service Agreement.

7.    <u>Compliance with HIPAA Transaction Standards</u>.  When providing its services and/or products, Business Associate shall comply with all applicable HIPAA standards and requirements (including, without limitation, those specified in 45 CFR Part 162) with respect to the transmission of health information in electronic form in connection with any transaction for which the Secretary has adopted a standard under HIPAA ("Covered Transactions").  Business Associate will make its services and/or products compliant with HIPAA's standards and requirements no less than thirty (30) days prior to the applicable compliance dates under HIPAA. Business Associate represents and warrants that it is aware of all current HIPAA standards and requirements regarding Covered Transactions, and Business Associate shall comply with any modifications to HIPAA standards and requirements which become effective from time to time.  Business Associate agrees that such compliance shall be at its sole cost and expense, which expense shall not be passed on to BSCHS in any form, including, but not limited to, increased fees. Business Associate shall require all of its agents and Subcontractors (if any) who assist Business Associate in providing its services and/or products to comply with the terms of this Section 7.

8.    <u>Miscellaneous</u>.

       a.    <u>No HIPAA Agency Relationship</u>. It is not intended that an agency relationship (as defined under the Federal common law of agency) be established hereby expressly or by implication between BSCHS and Business Associate for purposes of liability under HIPAA, HIPAA Regulations, or the HITECH Act. No terms or conditions contained in this BA Agreement shall be construed to make or render Business Associate an agent of BSCHS.

       b.    <u>Regulatory References</u>. A reference in this BA Agreement to a section in HIPAA, HIPAA Regulations, or the HITECH Act means the section as in effect or as amended or modified from time to time, including any corresponding provisions of subsequent superseding laws or regulations.

       c.    <u>Amendment</u>. The Parties agree to take such action as is necessary to amend the Services Agreement from time to time as is necessary for BSCHS to comply with the requirements of HIPAA, the HIPAA Regulations and the HITECH Act.

       d.    <u>Survival</u>. The respective rights and obligations of Business Associate under Sections 5(c), 6 and 8 of this BA Agreement shall survive the termination of the Services Agreement or this BA Agreement.

       e.    <u>Interpretation</u>. Any ambiguity in this BA Agreement shall be resolved to permit BSCHS to comply with HIPAA, HIPAA Regulations and the HITECH Act.

       f.    <u>Miscellaneous</u>.  The terms of this BA Agreement are hereby incorporated into the Services Agreement. Except as otherwise set forth in Section 8(e) of this BA Agreement, in the event of a conflict between the terms of this BA Agreement and the terms of the Services Agreement, the terms of this BA Agreement shall prevail.  The terms of the Services Agreement which are not modified by this BA Agreement shall remain in full force and effect in accordance with the terms thereof.  This BA Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, exclusive of conflict of law rules.  Each Party hereby agrees and consents that any legal action or proceeding with respect to this BA Agreement shall only be brought in the courts of the state where the BSCHS is located in the county where the BSCHS is located. The Services Agreement together with this BA Agreement constitutes the entire agreement between the Parties with respect to the subject matter contained herein, and this BA Agreement supersedes and replaces any former business associate

6

agreement or addendum entered into by the Parties. This BA Agreement may be executed in counterparts, each of which when taken together shall constitute one original. Any PDF or facsimile signatures to this BA Agreement shall be deemed original signatures to this BA Agreement. No amendments or modifications to the BA Agreement shall be effective unless executed by both Parties in writing.

IN WITNESS WHEREOF, the Parties have executed this BA Agreement as of the date set forth above.

**Bon Secours Charity Health System, Inc.**

By: _Mary Leahy_

Name: Mary Leahy.

Title: Chief Executive Officer

**Horizon Financial Management, LLC**

By: _Frank P. T_

Name: FRANK P. TERMINI

Title: Managing Partner